**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America ex rel. | ) | |
| RICHARD MORRIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CASE NO. 10 C 1957 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| MARCUS HARDY, Warden, | ) | |
| Stateville Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Richard Morris ("Morris" or "Petitioner") is currently incarcerated at Stateville Correctional Center in Joliet, Illinois. Marcus Hardy, the warden of the facility, has custody of Petitioner. Morris has filed a *pro se* writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, Petitioner's petition for a writ of habeas corpus [1] is respectfully denied. Petitioner's motion for a status [21] is denied as moot.

## I.     Background

### A.     Procedural Background

Petitioner has twice been tried and convicted in the Circuit Court of Cook County for the murder of Ervin Shorter. Resp. Exh. E at 3; *People v. Morris*, 807 N.E.2d 377, 381 (Ill. 2004). The first trial resulted in convictions and a death sentence that the Illinois Supreme Court vacated due to lack of meaningful representation under *United States v. Cronic*, 466 U.S. 648, 659 (1984). *Morris*, 807 N.E.2d at 403, 406-07. Upon retrial, Petitioner was convicted of first degree murder, aggravated vehicular hijacking, and aggravated kidnapping, and the trial court sentenced him to consecutive terms of sixty, thirty, and fifteen years, respectively. Resp. Exh. I

at 1-2. After he exhausted his state court appeals, Petitioner filed a Petition for Writ of Habeas Corpus. Respondent has answered.

### B. Factual Background

District court review of a habeas petition presumes all factual findings of the state court to be correct, absent clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007). Therefore, the Court adopts the following accounts from the Illinois Supreme Court's Order in *People v. Morris*, 807 N.E.2d 377 (Ill. 2004), as the Illinois Supreme Court is the last court to discuss the factual background of the underlying case in detail.

On the morning of Saturday, December 2, 1995, Petitioner and his co-conspirators kidnapped Ervin Shorter and forced him at gunpoint into the back of his own car. *Morris*, 807 N.E.2d at 380-82. Petitioner and his accomplices had started the morning intending to rob a bank; however, when they spotted Shorter's Impala, they reasoned that the Impala might be owned by a rich drug dealer, and it would be easier to rob a drug dealer than to rob a bank. *Id.* They soon realized that Shorter was not, in fact, a rich drug dealer—he was a fifty-eight-year-old laborer with Chicago's Streets and Sanitation department—so Petitioner decided that they needed to find a place to kill him before the targeted bank opened for business. *Id.* at 381-82.

Petitioner "pulled into an alley, stopped the car, got the car's owner out of the trunk and ordered him to his knees." *Id.* at 382. Shorter "began begging for his life, at which point [Petitioner] shot him twice" in the head. *Id.* As Petitioner and his cohorts drove away, they saw a police car. *Id.* "Shortly thereafter, [Petitioner] parked the Impala and the police again drove up." *Id.* Petitioner and co-conspirator Tywon Knight "jumped out of the car and ran." *Id.* While chased on foot by the police, Petitioner left the murder weapon, a .357 pistol, and the keys

to the Impala in an alley. *Id.* The police apprehended and arrested Petitioner, and Petitioner signed a written confession admitting to shooting Shorter twice in the head. *Id.* at 381-82.

During the first trial, a witness testified that she saw a light green shiny car in traffic around 7:40 a.m. on Saturday, December 2, 1995. She noticed that a person's fingers were sticking out of the trunk, moving around. *Id.* at 380. The fingers disappeared and then a ratchet handle appeared in the same space, moving back and forth. *Id.* The witness stopped and called 911, and again called police when she later learned of the Shorter murder. *Id.* She identified the light green car as Shorter's Impala. *Id.* at 381.

Two police officers, Stephen Lotts and Michael Lopresti, testified that they spotted a "silvery, bluish-green" Impala on School Street in Chicago and watched it turn and park on Paulina. *Id.* at 380. The officers saw Petitioner and Knight get out of the car and walk in front of the police car. *Id.* Petitioner and Knight made eye contact with the officers and ran. *Id.* Other officers joined Lotts and Lopresti in chasing Petitioner and Knight, and both were arrested a few minutes later. *Id.* at 380-81. Meanwhile, Officer Robert Hanrahan found Shorter's body in an alley, found his identification in his wallet, and reported the crime and Shorter's name to other officers over the radio. *Id.* at 381. Officers Lotts and Lopresti learned that the Impala was owned by Shorter, retraced the route of their foot chase with Petitioner, and located the .357 Magnum with two fired shells, a fully loaded .32 caliber revolver, a green glove, and a set of keys to the Impala. *Id.* Officers also found a shoeprint next to the .357 Magnum revolver. *Id.* The print was consistent with, but not a positive match to, Petitioner's shoes. *Id.*

Petitioner testified at his trial about Shorter's murder and about a prior murder he was involved with in Kenosha, Wisconsin:

> [Petitioner]'s trial testimony began with an explanation of the "problems in Kenosha" that had been mentioned in his statement introduced at trial. [Petitioner]

stated that, in 1995, he was living in Kenosha with Lyda. At that time, [Petitioner] was selling drugs. In early November 1995, [Petitioner] paged a man named Fred Jones in order to buy some cocaine. Jones came to [Petitioner]'s apartment and sold [Petitioner] an "eight ball" for $175. [Petitioner] then sold portions of the eight ball to his customers. [Petitioner]'s customers complained that the cocaine was bad.

[Petitioner] paged Jones again on November 30, 1995. Jones came to [Petitioner]'s apartment with another eight ball. Lyda and Hoover also were home at the time. Jones went into the living room and [Petitioner] went into the kitchen to get a scale. As [Petitioner] was getting the scale, Lyda came running out of the living room toward him with a look of fear on her face. Jones was running behind Lyda trying to grab her. [Petitioner] thought Jones was about to stick him up, so he grabbed Jones, put him in a bear hug, and wrestled him into the living room. [Petitioner] slammed Jones onto the living room floor, and Hoover hit Jones in the head with a golf club. [Petitioner] went back into the kitchen to check on Lyda. When [Petitioner] returned to the living room, Hoover was still hitting Jones in the head with a golf club. [Petitioner] put a towel around Jones' neck and strangled him.

When they determined that Jones was dead, [Petitioner] and Hoover wrapped his body in blankets with a cable cord and put it into a hall closet. [Petitioner] also took a .357 from Jones' pocket. [Petitioner], Hoover and Lyda then walked over to Knight's house and Hoover got Knight's car keys. Hoover and [Petitioner] put Jones' body into the trunk of Knight's car. [Petitioner], Hoover and Lyda then drove from Kenosha to Chicago, stopping at a grocery store to buy lighter fluid. Hoover and [Petitioner] agreed that they had to get rid of Jones' body and that the best way to get rid of it would be to burn it. They drove to an alley, where [Petitioner] and Hoover poured lighter fluid on the blankets and the body and then lit the lighter fluid. [Petitioner] guessed it was after midnight on December 1, 1995, at this point. Hoover, [Petitioner] and Lyda then drove back to Kenosha and picked up Knight. The next morning, Knight drove Hoover, [Petitioner] and Lyda back to Illinois.

[Petitioner] stated that it was Hoover who suggested that they rob a bank. Before they found a bank to rob, they got off an expressway onto Garfield Avenue and saw Ervin Shorter's car at a Kentucky Fried Chicken restaurant. [Petitioner] claimed that Hoover, not [Petitioner], suggested that the car's owner could be a highly paid drug dealer and would be easier to rob than a bank. Hoover got out of the car and pointed his gun in the driver's side window of Shorter's car. Shorter moved over, so Hoover went over to the passenger's side and got in while Knight got into the driver's side of the car. [Petitioner] then got into the back seat and took the .357 from Hoover. Hoover asked Shorter to give him the "dope" and the money. Shorter replied that he did not have any money or dope.

[Petitioner] also claimed that it was Hoover's idea to kill Shorter. [Petitioner] said that when they stopped in the alley where Shorter's body was found, Hoover grabbed the .357, opened the trunk and ordered Shorter out. [Petitioner] knew Hoover planned to kill Shorter, so he closed the trunk of the car, walked around to the front of the car, and told Hoover that he was not going to have anything to do with the shooting. [Petitioner] got into the driver's seat of the car and waited for Hoover. While he was waiting, he heard two shots. Hoover then got into the passenger's side and they drove off. [Petitioner] drove for a short time and then pulled the car over. At that point, Hoover got out of Shorter's car and Knight got in. [Petitioner] admitted that he dropped the .357 and Shorter's car keys while the police were chasing him.

[Petitioner] denied shooting Shorter and claimed that he had lied when he confessed in his statement to being the shooter. [Petitioner] explained that when he learned his wife was in custody, he asked a detective if there was anything [Petitioner] could do to ensure that his wife would go free. The detective did not promise [Petitioner] anything, but told [Petitioner] the officers would have to see how the story went. [Petitioner] said he told the officers about the incident in Kenosha, but did not mention Hoover at first. [Petitioner] told the officers that he had killed Fred Jones and also told them that Knight, not Hoover, helped him carry Jones' body out of the apartment. [Petitioner] said that he did not mention Hoover at first because he thought Hoover could take care of Lyda while [Petitioner] was in prison. [Petitioner] also lied to police when he told them that he made Lyda watch him beat Fred Jones to death and that he told Lyda she would be next if she said anything to the police. [Petitioner] said that he initially ran from Officers Lott and Lopresti because he wanted to throw away the gun and the car keys.

*Id.* at 381-84.

The jury found Petitioner guilty of first degree murder, aggravated vehicular hijacking, and aggravated kidnapping; found that Petitioner was eligible for the death penalty; and found no mitigating factors sufficient to preclude imposing the death penalty. *Id.* at 384. The trial court sentenced Petitioner to death for first degree murder. *Id.*

On direct appeal to the Illinois Supreme Court, Petitioner argued, among other things, that: (1) the trial court erred in denying his motion to suppress his confession; and (2) that trial counsel was ineffective for discussing in opening statements and presenting evidence regarding Fred Jones's murder committed by Petitioner thirty-six hours prior to Shorter's murder. Resp.

Exh. A at 19-31.  The court began its analysis by reciting the facts surrounding the motion to

suppress:

> [Petitioner] was interviewed four times at the police station by Detective David
> Ryan and Officer Thomas Keane.  During each interview, [Petitioner] stated that
> he understood his *Miranda* rights and was waiving them.
>
> The notes of Detective Ryan and Officer Keane revealed that [Petitioner]'s first
> interview took place at 2:10 p.m. on December 2, 1995. [Petitioner] stated that he
> lived in Kenosha, Wisconsin, with his wife, Lyda Antia, and sold drugs for a
> living.  On November 30, 1995, he killed Fred, a drug dealer, because Fred had
> sold him some bad drugs. [Petitioner] had sold those drugs to his customers, and
> his customers complained.  [Petitioner] choked Fred and beat him to death at
> [Petitioner]'s apartment. [Petitioner] forced Lyda to watch the beating and told
> her that he would kill her if she said anything. Later, [Petitioner] burned Fred's
> body somewhere on the west side of Chicago.  Although Fred had a gun, Fred
> never pulled the gun on [Petitioner].  [Petitioner] took Fred's gun.
>
> [Petitioner] said that on December 2, 1995, he, Lyda, Knight and Hoover were
> driving in Chicago when [Petitioner] saw a newer Chevy Impala in a restaurant
> parking lot near the Garfield Avenue exit to the Dan Ryan expressway.
> [Petitioner] forced the owner of the Impala, Ervin Shorter, to move to the
> passenger side of the car.  Knight drove the Impala while [Petitioner] rode in the
> back.  [Petitioner] instructed Lyda to follow in Knight's car. They drove to the
> area around Belmont Avenue, where [Petitioner] spotted some banks that he
> wanted to check out in more detail. At some point, [Petitioner] put Shorter in the
> trunk of the Impala. [Petitioner] and Knight drove around looking for a spot to kill
> Shorter.  They forced Shorter to get out of the trunk.  [Petitioner] ordered Shorter
> to kneel.  Shorter pleaded for his life and covered his face.  [Petitioner] shot him
> twice. [Petitioner] and Knight got back into the Impala, with [Petitioner] driving.
>
> [Petitioner]'s second interview took place at 3 p.m. on December 2, 1995.  In that
> interview, [Petitioner] gave further details concerning the murder of Fred in
> Kenosha. [Petitioner] said that he used a four iron golf club to beat Fred.  He then
> took $200 from Fred's body, tied his body with a cable and wrapped it in a
> blanket.  Lyda called Knight to the apartment to help [Petitioner] remove the
> body.  [Petitioner] bought two cans of lighter fluid, opened the blanket, and
> sprayed the fluid directly on the body.  [Petitioner] then set the body on fire and
> threw the cans of lighter fluid on the roof of a nearby school building.
>
> Following Fred's murder, [Petitioner] wanted to rob a bank so he would have
> money to go to Atlanta, where an uncle lived.  Lyda was given the job of "casing"
> the bank.  Knight would help and would share in the proceeds of the robbery.
> They saw a banner on a bank indicating that the bank would open at 8 a.m.
> Meanwhile, [Petitioner] wanted to kill Shorter.  [Petitioner] and Knight were

driving in the Impala. They pulled into an alley and forced Shorter out of the trunk. Shorter pleaded for his life. [Petitioner] shot Shorter twice. [Petitioner] also told Knight to shoot Shorter because [Petitioner] did not want the only bullets in Shorter's body to be from [Petitioner]'s gun. Knight, however, did not fire his gun.

The third interview of [Petitioner] took place at 7 p.m. on December 2. In this interview, [Petitioner] stated that Brian Hoover was with Lyda and [Petitioner] when they burned Fred's body, and said that Hoover had taken the money from Fred's body. Hoover used some of Fred's money to buy the lighter fluid. Hoover also was along during Shorter's kidnapping and murder. [Petitioner] had not told the officers of Hoover's role in the events because he wanted Hoover to remain free to take care of Lyda.

The fourth interview of [Petitioner] took place at 8:35 p.m. In this interview, [Petitioner] detailed the group's intention to rob Shorter and use his car in a bank robbery. [Petitioner] also detailed the roles that Lyda, Knight and Hoover were to play in the bank robbery. While they were waiting for the bank to open, [Petitioner] told Hoover and Knight that he needed to find a spot to get rid of Shorter. They drove to one alley, then to another. [Petitioner] forced Shorter out of the trunk. Shorter pleaded for his life as he knelt on the ground. [Petitioner] shot Shorter twice. [Petitioner] drove away in the Impala with Knight. [Petitioner] parked the Impala because they had planned to use Knight's car to case the bank.

In addition to his interviews with Detective Ryan and Officer Keane, [Petitioner] also spoke with Assistant State's Attorney Steven DiNolfo. DiNolfo first met with [Petitioner] around 10 p.m. on December 2, 1995. DiNolfo advised [Petitioner] of his *Miranda* rights, and [Petitioner] stated he understood those rights. [Petitioner] then agreed to talk to DiNolfo about the shooting of Ervin Shorter. [Petitioner] spoke with DiNolfo for around 25 to 30 minutes. DiNolfo interviewed [Petitioner] a second time around 12:15 a.m. on December 3, 1995. Prior to this second interview, DiNolfo again advised [Petitioner] of his *Miranda* rights. DiNolfo spoke with [Petitioner] for approximately 20 minutes. At the conclusion of this interview, [Petitioner] chose to have DiNolfo prepare a handwritten statement. DiNolfo prepared the handwritten statement around 12:45 a.m. [Petitioner] initialed each page of the statement and made corrections to the statement. As noted, this statement was introduced into evidence at trial.

The circuit court held a hearing on [Petitioner]'s motion to suppress. At the hearing on [Petitioner]'s motion to suppress, Officer Lotts testified that on Saturday, December 2, 1995, he and Lopresti were wearing uniforms and were in a marked squad car. Lotts said that when [Petitioner] and Knight were crossing Paulina, they looked and made eye contact with the officers.

Lotts testified that the men had a look of surprise, shock and fear when they made eye contact with him. When the officers saw [Petitioner] and Knight begin running, they parked their squad car and pursued them. Lotts testified that he knew the area had a problem with auto theft, so when he saw the men run into the alley, he believed there was a possibility that the Impala was stolen. At that point, however, Lotts had no information that the car in fact had been stolen.

Lotts temporarily lost sight of the men, but surmised that they had jumped a six-foot-high metal fence when he heard the lock on the fence clanging. Lotts looked in the direction of the fence and saw [Petitioner] and Knight crouched in the gangway between two homes on School Street. Lotts yelled, "Stop, police." [Petitioner] and Knights [*sic*] made eye contact with Lotts, then continued running northbound through the alley. Lotts again yelled at the men to stop. Because Lotts was separated from [Petitioner] and Knight by a six-foot fence, he ran back out of the alley to Paulina, where he met up with Officer Lopresti. The officers got back into their squad car and saw the men run out of another alley heading westbound toward Henderson. The officers then drove down Henderson. The officers saw a man on the street point toward the direction of 1727 West Henderson. There the officers saw Knight enter a narrow gangway. Lotts and Lopresti got out of the squad car and chased Knight. They were able to apprehend and handcuff Knight.

Lopresti then ran through the backyard of 1727 West Henderson and into an alley, at which point Lotts lost sight of Lopresti. Lotts walked Knight back to Henderson, then radioed for a police car to come and pick up Knight. Lotts ran the license plates on the Impala and, as he was doing so, Lopresti came back to the squad car. Lotts ran the plates around 8:08 a.m.

On cross-examination, Lotts testified that while he was running the plate on the Impala, he was joined by Officer Goldman as well as Officer Lopresti. Officer Goldman said that a citizen had flagged him down because the citizen had seen a hand reaching out from the trunk of a car with the license plate ETM 734. Less than a minute after calling in the license plate, Lotts learned that the owner of the car was Ervin Shorter.

Lotts further testified on cross-examination that prior to the time that he ran the Impala's license plate, he heard over the radio that Officer Hanrahan was being dispatched to the 1800 block of Newport, where a man had been shot. Around 8:10 a.m., Lotts heard Officer Hanrahan radio that he had identified the victim as Ervin Shorter.

Officer Lopresti testified at the hearing on [Petitioner]'s motion to suppress that, after Knight was handcuffed, he went to an alley in the 1700 block of Henderson looking for [Petitioner]. Lopresti met up with Officer Conley. Lopresti and Conley saw [Petitioner] hidden behind some garbage cans. [Petitioner] ran out and continued to run even after Lopresti yelled for [Petitioner] to stop. Lopresti

chased [Petitioner] but was unable to catch him. Lopresti then saw [Petitioner] hiding under some debris in a garage at 1753 West School Street. Prior to seeing [Petitioner] hiding under the debris, Lopresti had not received any information about any crimes committed in the vicinity, had not received any information regarding the Impala, and had not received any information concerning [Petitioner]. Lopresti and another officer pulled [Petitioner] from the debris and placed him in handcuffs. Lopresti explained that he was detaining [Petitioner] to determine why he had been running from the police. Lopresti said there had been a high number of garage burglaries and auto theft in the area. In addition, when [Petitioner] and Knight first saw the officers, they looked at the officers very suspiciously with fear in their eyes and did not stop when ordered to do so. Lopresti explained that the neighborhood where the activities took place was a residential, primarily white neighborhood. [Petitioner] ultimately was detained around 7:50 a.m.

On cross-examination, Lopresti testified that immediately after [Petitioner] was detained, he heard the dispatcher call Officer Hanrahan with a report of a person shot in the alley at 1830 West Newport. 1830 West Newport is approximately 2 to 2 1/2 blocks from where the chase of [Petitioner] had started. Around two minutes later, Lopresti heard Officer Hanrahan over the radio report that the shooting victim was deceased. At 8:10 a.m., Lopresti heard over the radio that the Impala was registered to Ervin Shorter. Lopresti also heard Officer Hanrahan over the radio respond that Ervin Shorter was the victim that he had in the alley.

Following the hearing, the trial court made its findings of fact and conclusions of law. The trial court found that [Petitioner] had been taken into custody at 7:52 a.m. on December 2, 1995. The trial court further found that neither officer had knowledge of a particular offense during the chase or apprehension of [Petitioner], nor was the apprehension of [Petitioner] based upon a search warrant, arrest warrant or any other legal process. At 8:01 a.m., the officers learned that the Impala was registered to Ervin Shorter. At 8:06 a.m., Officer Goldman told Officer Lotts that a citizen had seen a person's hand coming out of the trunk of an Impala with license plate number ETM 734. Officer Hanrahan was dispatched to a shooting in the 1800 block of west Newport, 2 1/2 blocks from where the Impala had been parked. By 8:10 a.m., Officers Lotts and Lopresti learned that the victim in the shooting was Ervin Shorter.

Based upon the foregoing facts, the trial court found that the stop of [Petitioner] was a *Terry* stop. The trial court further held that there was a sufficient basis for the stop, given the officers' knowledge of the area and their observations of [Petitioner] and Knight prior to their detention. The trial court also held that even if it were to find that [Petitioner] was subject to a full custodial arrest at the time he was placed in handcuffs, there was a sufficient intervening factor which provided a basis to arrest [Petitioner] and Knight.

*Morris*, 807 N.E.2d at 384-87.

Petitioner argued to the Illinois Supreme Court that: (1) his detention was an arrest, not a *Terry* stop, and that it was not supported by probable cause; (2) even if it were a *Terry* stop, the officers lacked the requisite reasonable suspicion; and (3) his statements should have been suppressed because they were not sufficiently attenuated from his illegal arrest. *Id.* at 387. The Court held, as the State conceded, that the initial arrest of Petitioner was illegal, but that the evidence Petitioner tossed aside while fleeing from the police was not the fruit of an illegal arrest under *California v. Hodari D.*, 499 U.S. 621, 629 (1991) (arrest did not occur during flight, thus items tossed aside during flight were abandoned prior to seizure). See *Morris*, 807 N.E.2d at 389. As to Petitioner's statements, the Court held that, under *Wong Sun v. United States*, 371 U.S. 471, 488 (1963), and *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975), the statements were sufficiently attenuated from the illegal arrest to be admissible because *Miranda* warnings were given prior to each statement, there was intervening probable cause in the form of the Impala being registered to a person recently found shot to death, and sufficient time passed (six hours) between the arrest and the initial statement to the police. See *Morris*, 807 N.E.2d at 390-92.

Petitioner also argued that his trial counsel was ineffective for discussing the Jones murder in opening statements and for presenting evidence about that murder through Petitioner's testimony. *Id.* at 392. The Illinois Supreme Court agreed, holding that counsel's extensive discussion and presentation of the circumstances of the Jones murder was *per se* ineffective under *Cronic*. *Id.* at 403-04. The Supreme Court noted that "[d]efense counsel's decision to employ a nonlegal defense is not, by itself, reason to conclude that counsel's assistance in the case at bar falls under the standard of per se ineffective assistance[,]" because in some difficult circumstances it can be appropriate to make a "nonlegal plea for jury sympathy." *Id.* at 405-06. However, the Court found that in this case, defense counsel had misunderstood a trial court

ruling that the Jones murder was inadmissible, and presenting these details through her opening statement and Petitioner's trial testimony removed "any hope" of jury sympathy for the Shorter murder.  *Id.* at 406-07.  The Court reversed Petitioner's convictions and granted a new trial.[1]  *Id.* at 407.

On retrial, the circuit court admitted Petitioner's testimony from the first trial, redacting any testimony related to the Jones murder.  Resp. Exh. I at 2, 4-5.  Petitioner again was found guilty of first degree murder, aggravated vehicular hijacking, and aggravated kidnapping, and sentenced to consecutive terms of sixty, thirty, and fifteen years, respectively.  *Id.* at 1.  On appeal, Petitioner argued, among other things, that his former testimony was not admissible.  *Id.* at 2.  On March 27, 2009, the Appellate Court affirmed Petitioner's convictions and sentences. *Id.* at 1, 7.  The court noted that the circuit court's decision to admit this testimony was reviewed for an abuse of discretion, and held that the circuit court did not abuse its discretion because the Illinois Supreme Court's holding was based on the evidence related to the Jones murder, the testimony in question was "not compelled by any illegally obtained evidence and [was] not fruit of the poisonous tree," and the Supreme Court had noted that Petitioner's decision to testify was part of an acceptable strategy to seek the jury's sympathy.  *Id.* at 5.

On May 1, 2009, Petitioner filed a PLA.  See Resp. Exh. J.  Noting that "[t]here is no question that the caselaw on this issue is extremely limited," Petitioner argued that his prior testimony was admitted in violation of his constitutional rights.  *Id.* at 15.  On September 30, 2009, the Illinois Supreme Court denied Petitioner's PLA.  Resp. Exh. K.  Petitioner has not filed a state court post-conviction petition or any other collateral challenge to his convictions.

---

[1]  After oral argument and while the case was under advisement, in January 2003, then Governor George Ryan commuted Petitioner's sentence to life imprisonment as part of a mass commutation.  Morris, 807 N.E.2d at 380 n.1.

Following the denial of his PLA, Petitioner filed the present habeas petition, raising two claims. First, Petitioner maintains that the Illinois Appellate Court violated clearly established Supreme Court precedent when it affirmed the trial court's admission of Petitioner's testimony from his first trial, even though the Illinois Supreme Court had held that defense counsel in the first trial was ineffective for introducing evidence through Petitioner's testimony in the first trial. Second, Petitioner contends that his confession to the police was involuntary and his first trial counsel was ineffective for failing to exclude the confession. The petition for habeas relief is timely under 28 U.S.C. § 2244(d), none of the claims are barred by non-retroactivity, and Petitioner has exhausted his state court remedies for the claims because no state avenues remain by which Petitioner may present them. See 28 U.S.C. § 2254(c).

## II. Legal Standards

### A. Federal Habeas Relief for State Prisoners

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a habeas petition cannot be granted unless the decision of the state court "was contrary to, or involved an unreasonable application of clearly established Federal law," or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1–2) (2000).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law; [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the United States Supreme Court.]" *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "Avoiding these pitfalls does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme

Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

A state court's decision constitutes an "unreasonable application" of clearly established federal law if the state court identified the correct legal rule but unreasonably applied the controlling law to the facts of the case. *Williams*, 529 U.S. at 407. It should be noted than "an unreasonable application of federal law is different from an *incorrect* application of federal law." *Id.* at 410. Rather, "unreasonable" means that a state court's decision lies "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

### B.      The Exhaustion Doctrine

Prior to filing a habeas petition in federal court, a petitioner seeking relief from state custody must have "fully and fairly presented his claims to the state appellate courts, thus giving the state courts a meaningful opportunity to consider the substance of the claims that he later presents in his federal challenge." *Bintz v. Bertrand*, 403 F.3d 859, 863 (7th Cir. 2005); see also 28 USCS § 2254(b), (c); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This exhaustion requirement "serves an interest in federal-state comity by giving state courts the first opportunity to address and correct potential violations of a prisoner's federal rights." *Perruquet v. Briley*, 390 F.3d 505, 513 (7th Cir. 2004) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1972)). It requires the petitioner to assert each of his or her federal claims through one complete round of state-court review, either on direct appeal of his or her conviction or in post-conviction proceedings, before proceeding to federal court. See *O'Sullivan,* 526 U.S. at 845; see also *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). This includes presentation of the claims to appellate courts where review is discretionary and such review is part of the ordinary appellate

procedure in the State. *O'Sullivan*, 526 U.S. at 847 (requiring a petitioner to present his claims to the Illinois Supreme Court in a petition for leave to file an appeal even though that Court's review was discretionary).

To fairly present a claim in state court, the petitioner must include both the operative facts and the controlling legal principles on which the claim is based, and must also alert the state court that the claim raised is based on federal law. *Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001); *Sweeney v. Carter*, 361 F.3d 327, 332 (7th Cir. 2004). If the federal court reviewing the habeas petition is not satisfied that the petitioner gave the state courts "a meaningful opportunity to pass upon the substance of the claims [] presented in federal court," the Court cannot reach the merits. *Chambers*, 264 F.3d at 737-38; see also *Sweeney*, 361 F.3d at 332.

"Where state remedies remain available to a habeas petitioner who has not fairly presented his constitutional claim(s) to the state courts, the exhaustion doctrine precludes a federal court from granting him relief on that claim: although a federal court now has the option of denying the claim on its merits, 28 U.S.C. § 2254(d)(2), it must otherwise dismiss his habeas petition without prejudice so that the petitioner may return to state court in order to litigate the claim(s)." *Perruquet*, 390 F.3d at 514 (citing *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Rose v. Lundy*, 455 U.S. 509, 522 (1982)); see also 28 U.S.C. § 2254(b)(1)(A); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Dressler v. McCaughtry*, 238 F.3d 908, 912 (7th Cir. 2001). However, where a petitioner already has pursued state court remedies and there is no longer any state corrective process available to him or her, "it is not the exhaustion doctrine that stands in the path of habeas relief, see 28 U.S.C. § 2254(b)(1)(B)(i), but rather the separate but related doctrine of procedural default." *Perruquet*, 390 F.3d at 514.

## C.     Procedural Default

The procedural default doctrine, also grounded in principles of comity, federalism, and judicial efficiency, ordinarily precludes a federal court from reaching the merits of a habeas claim when either (1) the claim that was presented to the state courts and the state court ruling against the petitioner rests on adequate and independent state law grounds, or (2) the claim was not presented to the state courts and it is clear that those courts would now hold the claim procedurally barred. *Id.*; see also *Coleman*, 501 U .S. at 735; *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989); *Conner v. McBride*, 375 F.3d 643, 648 (7th Cir. 2004). Thus, when a habeas petitioner has "exhausted his state court remedies without properly asserting his federal claim at each level of the state court review"—and the opportunity to raise that claim in state court has passed—the petitioner has procedurally defaulted that claim. *Lewis*, 390 F.3d at 1026. Similarly, procedural default on independent and adequate state grounds occurs where the state court explicitly invoked a state procedural bar rule as a separate basis for its decision to deny the petitioner relief, even if a state court reaches the merits of the petitioner's challenge to his or her conviction in an alternative holding. See *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Miranda v. Leibach*, 394 F.3d 984, 991 (7th Cir. 2005) ("the last state court to issue an opinion of a Petitioner's federal claim has resolved that claim on an adequate and independent state ground").

Once a court has determined that a petitioner has procedurally defaulted one or more habeas claims, the default can be overcome only if the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law" or, alternatively, show that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Under the cause and prejudice test, "cause for a default is ordinarily

established by showing that some type of external impediment prevented the petitioner from presenting his federal claim to the state courts." *Lewis*, 390 F.2d at 1026 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Prejudice is established by showing that the violation of the petitioner's federal rights created "not merely * * * a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Lewis*, 390 F.3d at 1026 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); see also *Lemons v. O'Sullivan*, 54 F.3d 357, 362 (7th Cir. 1995). A federal court may grant a procedurally defaulted habeas petition even in absence of cause in extraordinary cases where "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 466 U.S. at 496. In order to establish that a fundamental miscarriage of justice would result if habeas relief is denied, the petitioner must show that "no reasonable juror would have found him guilty of the crime but for the error(s) he attributes to the state court." *Lewis*, 390 F.3d at 1026 (quoting *Schlup v. Delo*, 513 U.S. 298, 327–29 (1995)).

## III. Analysis

### A. Claim One

As previously set forth, Petitioner maintains that the Illinois Appellate Court violated clearly established Supreme Court precedent when it affirmed the second trial court's admission of Petitioner's testimony from his first trial. Petitioner's first ground for relief presented the state Appellate Court with a unique question: whether the Illinois Supreme Court's ruling that counsel had been *per se* ineffective under *Cronic* for eliciting Petitioner's testimony that he murdered Jones required that the court on retrial exclude Petitioner's testimony that he murdered Shorter. Petitioner allowed that there was little authority on point, citing only one United State Supreme Court decision—*Harrison v. United States*, 392 U.S. 219 (1968)—which held that a

defendant's prior trial testimony is admissible in a retrial unless it was compelled by the admission of illegally obtained evidence. The Appellate Court explicitly acknowledged *Harrison*, but distinguished it because Petitioner's "testimony was not compelled by any illegally obtained evidence and [was] not fruit of any poisonous tree." Resp. Exh. I at 5. "Indeed, the [Illinois] Supreme Court [in the first appeal] noted that [Petitioner's] decision to testify was part of the defense strategy seeking to mitigate responsibility for the murder of Mr. Shorter." *Id*. The Appellate Court held that the trial court on retrial cured defense counsel's error by redacting all testimony related to the Jones murder. *Id.*

In *Harrison*, the defendant had testified in order to explain three confessions that the prosecution had admitted into evidence. 392 U.S. at 222. The appellate court subsequently ruled that the three confessions were illegally obtained. On remand, over the objection of defense counsel, the prosecutor read to the jury the defendant's testimony at the prior trial. *Id.* at 221. The United States Supreme Court recognized that the general evidentiary rule is

> that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.

*Id.* at 222. Nonetheless, the Supreme Court found that the prior testimony in *Harrison* was tainted by the illegally obtained confessions and should have been excluded upon retrial. *Id.* at 225-26.

Respondent claims that Petitioner testified based on his attorney's advice, not in response to illegally obtained evidence, and therefore neither *Harrison* nor any other Supreme Court case is directly on point and Petitioner cannot satisfy § 2254(d)'s requirement that the state court unreasonably applied a clearly established United States Supreme Court holding. See *Calloway*

*v. Montgomery*, 512 F.3d 940, 943-44 (7th Cir. 2008). Indeed, it is not enough that a Supreme Court holding be in the same ballpark; rather, the rule must be so "clearly established" that it is "embodied in a holding" of the Supreme Court. *Thaler v. Haynes*, __ U.S. __, 130 S. Ct. 1171, 1173 (Feb. 22, 2010) ("A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of this Court."); see also *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court * * * it cannot be said that the state court unreasonably applied clearly established Federal law."); *Calloway*, 512 F.3d at 944; *Lockhart v. Chandler*, 446 F.3d 721, 724 (7th Cir. 2006); *cf. Yancey v. Gilmore*, 113 F.3d 104, 106-07 (7th Cir. 1997) ("In short, without a Supreme Court case to support his claim, Yancey cannot satisfy the requirements of § 2254(d)(1).").

*Harrison* dealt explicitly with the scenario in which a defendant testified in order to explain evidence that was illegally obtained. It did not deal with the fact pattern at issue here— where a defendant testifies on the basis of his attorney's advice and a court later determines that counsel was ineffective for presenting prejudicial evidence through Petitioner's testimony (and for discussing prejudicial evidence in opening statements). Here, the Illinois Appellate Court noted that the Circuit Court's decision to admit this testimony was reviewed for an abuse of discretion, and held that the Circuit Court did not abuse its discretion because (1) the Illinois Supreme Court's holding was based on the evidence related to the Jones murder, (2) the testimony in question was "not compelled by any illegally obtained evidence and [was] not fruit of the poisonous tree," as was the case in *Harrison*, and (3) the Illinois Supreme Court had noted that Petitioner's decision to testify was part of an acceptable strategy to seek the jury's sympathy. *Id.* at 5.

Given the dearth of clear precedent governing the situation presented here, the Court cannot make the required leap from *Harrison* and conclude that the legal principle urged by Petitioner—that his entire prior trial testimony should have been excluded, not just the portions referring to the Jones murder—is "clearly established" and that the Appellate Court unreasonably applied clearly established federal law when it affirmed Petitioner's convictions and sentences in 2009. Shaping the Court's analysis is the reasoning behind the Illinois Supreme Court's decision finding ineffective assistance of counsel. The Illinois Supreme Court found that defense counsel's decision to employ a nonlegal defense—by having Petitioner testify to mitigate his involvement in the Shorter murder—was not, by itself, reason to conclude that counsel's assistance fell under the standard of *per se* ineffective assistance, noting that in certain circumstances it can be appropriate to make a "nonlegal plea for jury sympathy." *People v. Morris*, 807 N.E.2d 377, 405-06 (Ill. 2004). However, the Supreme Court, citing an "unusual convergence of errors," found that defense counsel had misunderstood a trial court ruling regarding the Jones murder and presenting these details through her opening statement and Petitioner's trial testimony removed "any hope" of jury sympathy for the Shorter murder, resulting in a total breakdown of the adversarial process. *Id.* at 406-07. On remand, although the Circuit Court admitted Petitioner's testimony from the first trial, the court redacted any testimony related to the Jones murder, which was the chief concern of the Supreme Court. Thus, in the second trial, the Circuit Court barred the testimony that the Supreme Court found highly problematic and admitted only prior testimony related to the Shorter murder.

Again, this Court cannot say that it was unreasonable for the Illinois Appellate Court to uphold the Circuit Court's determination that, under the Supreme Court's prior ruling, counsel's handling of the Jones murder rose to the level of ineffective assistance, but advising Petitioner to

testify as a mitigation tactic did not. To be sure, Petitioner raises a legitimate issue. Although Petitioner has not pointed to, and the Court has not found, a case directly addressing the issue raised, given the holdings in *Harrison* and *Hattery* there may be some circumstances in which a finding that counsel has been *per se* ineffective would taint counsel's advice across the board. If this were such a case, then the introduction into evidence at Petitioner's retrial of *any* testimony from the first trial may have violated Petitioner's constitutional rights.

However, two things foreclose such a conclusion in the present case. First, the record reflects that part of the strategy in the first trial was for Petitioner to take the stand in an effort to mitigate other evidence of his involvement in the murder. After his arrest, Petitioner confessed to being the shooter, but then at trial he testified that he told Hoover that he was not going to have anything to do with the shooting and that Hoover shot Shorter. The Court cannot say it was unreasonable for the Circuit Court and the Appellate Court on remand to conclude that this portion of counsel's strategy was acceptable and therefore the prior testimony about Petitioner's involvement in the Shorter murder was properly admitted.

Second, and even more problematic for Petitioner, is the overwhelming amount of evidence introduced against him at trial. The question on habeas review is whether an alleged error "had a substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 639-44 (1993)); see also *Garth v. Davis*, 470 F.3d 702, 712 (7th Cir. 2006). Thus, even if Petitioner could show that the state appellate court's decision was unreasonable, he also must establish that such error was prejudicial. Here, Petitioner was arrested after having parked a car registered to Shorter, whose body was found in a nearby alleyway around the same time Petitioner was arrested. *Morris*, 807 N.E.2d at 380-82. A witness had called 911 earlier that morning to report

that a person was in the trunk of a car matching the description of Shorter's vehicle. *Id.* at 380-71. After the police chased Petitioner on foot to arrest him, they found keys to Shorter's car and the murder weapon along the path of Petitioner's flight. *Id.* at 381. A green glove recovered along the route matched a glove recovered from Petitioner at the police station. *Id.* And Petitioner confessed in detail to the police (and also signed a written statement admitting to his role in the crime). *Id.* at 380-82. Thus, even if the trial court should have excluded Petitioner's testimony from his first trial to the effect that he killed Shorter, the evidence of guilt is so overwhelming that any error was harmless under *Brecht*.

## B.  Claim Two

In claim two, Petitioner argues that trial counsel's motion to suppress evidence (before the first trial) was inadequate, that counsel failed to investigate witnesses who could have corroborated his allegations of coercion, and that he was questioned over a sixteen-hour period and interrogated until his will was overborne. Respondent maintains that these points are procedurally defaulted because they were never raised on appeal in state court.

Although an ineffective assistance claim is "a single ground of relief," a state prisoner must give the state courts a full and fair opportunity to review all factual bases for that claim. See *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing 28 U.S.C. § 2254(b)(1)(A); *Stevens v. McBride*, 489 F.3d 888, 894 (7th Cir. 2007)); see also *Ebert v. Gaetz*, 610 F.3d 404, 412 n.2 (7th Cir. 2010) (finding that a "particular factual basis" for petitioner's ineffective assistance of counsel claim was procedurally defaulted because petitioner did not fully present it to the state courts). "Adequate presentation of a claim to the state courts requires the petitioner to present both the operative facts and the legal principles that control each claim." *Pole*, 570 F.3d at 934-35 (citing *Thompson v. Battaglia*, 458 F.3d 614, 616 (7th Cir. 2006)). Thus, a

petitioner making an ineffective assistance claim must fairly present all factual grounds for that claim at all levels of state court litigation. See *Stevens*, 489 F.3d at 894 ("the failure to alert the state court to a complaint about one aspect of counsel's assistance will lead to procedural default").

On direct appeal from the first trial, Petitioner presented twelve issues for review, including that his counsel was ineffective for discussing the Jones murder in her opening and then presenting evidence about the murder because she mistakenly believed that the court had ruled that the state could present evidence of the murder in its rebuttal case. None of Petitioner's arguments in his first direct appeal raised the claim that counsel was ineffective for failing to investigate and make a claim that the confession was coerced. See *id.* at 27-30 (arguing that counsel was ineffective for presenting evidence of the Jones murder). And Petitioner's appellate briefs and PLA from his conviction after retrial do not contain any argument regarding the suppression motion or police coercion. See Resp. Exhs. F & J. Since neither Petitioner's appellate briefs nor his PLA to the Illinois Supreme Court raised the legal arguments or factual bases for the ineffective assistance of counsel claim presented in his habeas petition, that claim is procedurally defaulted. See *Pole*, 570 F.3d at 934-35.

As set forth above, a federal court may review a procedurally defaulted claim only in two rare circumstances—if the petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law" or, alternatively, show that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Petitioner has not demonstrated cause and prejudice or a fundamental miscarriage of justice to excuse his default. Indeed, Petitioner makes no contention and provides no evidence that he actually is innocent. Additionally, he did not set forth any facts in his petition highlighting some

type of external impediment that prevented him from presenting his federal claim to the state courts. See *Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008) (when petitioner fails to argue cause and prejudice and fundamental miscarriage of justice, "we cannot consider his claim"); see also *Lewis v. Sternes*, 390 F.3d 1019, 1026-27 ("[A] claim of ineffectiveness must itself have been fairly presented to the state courts before it can establish cause for a procedural default of another claim") (citing *Edwards v. Carpenter*, 529 U.S. 446, 452-54 (2000)).

## IV.     Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Petitioner Morris a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition; instead, he must first request a certificate of appealability. See *Miller–El v. Cockrell*, 537 U.S. 322, 335 (2003); *Sandoval v. United States*, 574 F.3d 847, 852 (7th Cir. 2009). A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *Miller–El*, 537 U.S. at 336; *Evans v. Circuit Court of Cook County, Ill.*, 569 F.3d 665, 667 (7th Cir. 2009). Under this standard, Petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El*, 537 U.S. at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). And in cases where a district court denies a habeas claim on procedural grounds, the habeas court should issue a certificate of appealability only if the petitioner shows that (1) jurists of reason would find it debatable

whether the petition states a valid claim of the denial of a constitutional right, and (2) jurists of reason would find it debatable whether the district court was correct in its procedural ruling.  See *Slack,* 529 U.S. at 485.

The Court concludes that Petitioner has not made a substantial showing of the denial of a constitutional right, nor would reasonable jurists differ on whether claim two is procedurally defaulted.  Thus, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

**V.      Conclusion**

For the reasons stated above, Petitioner Morris's petition for writ of habeas corpus [1] is respectfully denied.  The Court also declines to certify any issues for appeal under 28 U.S.C. § 2253(c)(2).  Petitioner's motion for a status [21] is denied as moot.

Dated: August 4, 2011                                    _____
                                                                           Robert M. Dow, Jr.
                                                                           United States District Judge